IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

CATHERINE PATTISON,                    )
                                       )
    Plaintiff,                         )
                                       )
v.                                     )  Civil Action No. 1:25-cv-630 (RDA/LRV)
                                       )
JSI TELECOM, INC.,                     )
                                       )
    Defendant.                         )

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant JSI Telecom, Inc.'s Motion for Summary Judgment (Dkt. 19) (the "MSJ"). This Court has dispensed with oral argument as it would not aid in the decisional process. *See* Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter has been fully briefed and is now ripe for disposition. Considering the Motion together with the Memoranda in Support (Dkts. 20, 21), Plaintiff's Opposition (Dkts. 23, 27), and Defendant's Reply (Dkts. 31, 32), this Court GRANTS the MSJ for the reasons that follow.[1]

## I.  PROCEDURAL BACKGROUND

Plaintiff Catherine Pattison filed her Complaint on April 14, 2025. Dkt. 1. On May 15, 2025, Defendant filed its Answer. Dkt. 6. On May 16, 2025, this Court issued its Scheduling Order. Dkt. 7. On June 11, 2025, U.S. Magistrate Judge Lindsey R. Vaala issued her Rule 16(b) Scheduling Order, which specifically discussed the manner by which the parties should submit any summary judgment briefing. Dkt. 10 at ¶ 14(f). That same day, the Court amended its Scheduling Order to amend the deadline for motions for summary judgment. Dkt. 11.

---

[1] Except with respect to citations to deposition testimony, all page number citations refer to the CM/ECF assigned page numbers.

1

On October 31, 2025, Defendant filed its MSJ.  Dkt. 19.[2]  On November 14, 2025, Plaintiff filed her Opposition.  Dkt. 23.  On November 20, 2025, Defendant filed its Reply.  Dkt. 31.

## II.  UNDISPUTED STATEMENT OF FACTS

Summary judgment is appropriate only where there are no genuine disputes of material fact.  *See* Fed. R. Civ. P. 56.  In additional to Rule 56 and the Local Rules, in her Rule 16(b) Scheduling Order, Magistrate Judge Lindsey R. Vaala was abundantly clear that any asserted fact or disputed fact must be "with appropriate citations to the record."  Dkt. 10 ¶ 14(f).  Despite the straightforward instructions provided by the Rules and Judge Vaala's Order, as discussed *infra*, a number of facts asserted by Defendant and disputes asserted by Plaintiff failed to provide appropriate citations to the record.  Moreover, both sides engaged in improper characterizations and legal conclusions with respect to various assertions of fact or disputes of fact.  These failures to comply with the Rules and Judge Vaala's Order made the Court's task of discerning which facts were properly considered undisputed more difficult.

Accordingly, the following statement of facts is derived from a careful review of (i) Defendant's statement of undisputed facts; (ii) Plaintiff's Opposition to those facts; and (iii) the summary judgment record as a whole.  Given this, the undisputed facts are as follows:

1.  Plaintiff was hired by Defendant as a Senior Sales Manager on June 1, 2020.  Although Defendant's former president, Mike Horn, signed Plaintiff's offer letter, the incoming president, Josh McKenna, recommended that Plaintiff be hired and salary.[3]

---

[2] The Memorandum in Support of the MSJ (Dkt. 20) is incorrectly referred to on the docket as in support of a Motion for Judgment on the Pleadings.  The document itself is correctly titled, but the CM/ECF assigned name is incorrect.

[3] Plaintiff attempts to dispute that McKenna recommended that she be hired.  Dkt. 20 at 2 ¶ 2. The evidence cited by Plaintiff supports that Horn hired her and set her salary, and nothing in her deposition nor her offer letter contradicts the asserted fact, supported by McKenna's deposition, that she was hired on his recommendation.  Accordingly, the asserted fact has been modified to reflect Horn's role, but there is no genuine dispute of fact.

2. Plaintiff's salary as Senior Sales Manager was $10,000 more than McKenna's salary when he held that position.  Neither earned commissions in that position.[4]

3. On August 1, 2021, McKenna was promoted to President and Plaintiff became the Director of Growth.  The new title indicated the same position and responsibilities as McKenna's prior title as Director of Sales.  Plaintiff was responsible for Defendant's sales worldwide. McKenna took a cut in compensation. Plaintiff received a raise to $165,000 plus commission under the existing commission policy.  The base salary for Plaintiff in her first year was the same as McKenna's salary in his immediately preceding last year.[5]

4. As Director of Growth, Plaintiff managed a sales team of four to five people, which grew to seven individuals.[6]

5. Plaintiff earned no sales commissions in her first year.  McKenna voluntarily, and unknown to Plaintiff, took $15,000 of his own commissions and had them paid to Plaintiff as

---

[4] Plaintiff attempts to dispute that she was paid $10,000 more than McKenna in the same role. Defendant supported this asserted fact with the declaration Human Resources Manager Anca Bilegan. Dkt. 20-2 ¶ 4.  Plaintiff generally attacks the credibility of Bilegan, which is inappropriate at summary judgment.  *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 569 (4th Cir. 2015) ("The court therefore cannot weigh the evidence or make credibility determinations.").  Plaintiff also attaches her own declaration, which does not dispute the asserted fact that she was paid $10,000 more but instead disputes the implication that, accounting for inflation, she and McKenna would have been paid roughly the same amount.  Dkt. 23-3 ¶ 3.  Rule 56 requires that declarations used to support summary judgment must "set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  Here, to the extent that Plaintiff's declaration attempts to dispute that she was paid more than McKenna for the same role, she does not set forth her basis for any personal knowledge of McKenna's salary prior to her hiring.  Accordingly, there is no genuine dispute of material fact.

[5] Plaintiff attempts to dispute that the Director title indicated that she had the same responsibilities as McKenna in his Director role.  Dkt. 23 at 7.  In this regard, Plaintiff cites a portion of her deposition testimony which is referencing a different time period than the asserted fact.  Dkt. 23-1 at 68-69 (referring 2022 time period); Dkt. 20 ¶ 3 (referring to 2021 time period). Plaintiff also cites her declaration, which refers to a different position.  Dkt. 23-3 ¶ 7 (referring to position of Vice President); Dkt. 20 ¶ 3 (referring to Director of Growth and New Markets position).  In any event, none of the information cited by Plaintiff contradicts the asserted fact that the Director of Growth and New Markets position was similar in title and responsibilities to the Director of Sales position.  Accordingly, there is no genuine dispute of material fact.

[6] Plaintiff attempts to dispute the number of people that she managed by citing to Defendant's organizational chart.  The organizational chart supports that, in 2023, Plaintiff managed seven people. Dkt. 23-4.  Plaintiff does not cite any evidence regarding how many people she managed at the time she started the Director position, nor does she cite any evidence which supports her assertion regarding part-time consultants.  Dkt. 23 at 7.  Accordingly, there is no genuine dispute of material fact.

3

commissions.  The voluntary diversion by McKenna of his own commissions to Plaintiff continued through her termination.[7]

6.  McKenna was pleased with most of Plaintiff's initial performance as Director of Growth. McKenna gave Pattison what she characterized as an excellent performance review on March 2, 2022.  Plaintiff received a raise in her base salary to $180,000 per year with a commission.  Plaintiff again earned no sales commissions; McKenna, who was entitled to more than $90,000 in commissions, voluntarily had half of his commissions directed to Plaintiff such that they each received $46,668.[8]

7.  Plaintiff became pregnant and applied for and took leave under the Family and Medical Leave Act (the "FMLA") in July 2022.

8.  Under federal law, an employer need not pay an employee on FMLA leave; Defendant does not but makes other arrangements. For the first eight weeks of the twelve-week period, Defendant's employees are eligible to take short-term disability leave, which is paid by New York Life.  Plaintiff did this.  Plaintiff's leave was approved promptly and in full.

9.  Prior to going on FMLA leave, Plaintiff spoke with Bilegan and arranged to take her final four weeks of FMLA leave as paid leave as paid under Defendant's "Time-in-Lieu" ("TIL") program.  TIL is additional paid leave made available to certain employees in addition to paid time off ("PTO").  One reason for an employee to take TIL rather than PTO is that TIL expires at the end of the year, while some PTO carries over from year to year.

---

[7] Plaintiff attempts to dispute the asserted facts by citing her declaration and deposition. Plaintiff does not dispute that she did not earn any commissions and, indeed, Plaintiff concedes that she did not "submit reports" in her first year in the position. Dkt. 23-3 ¶ 5. Plaintiff does not deny that she received a commission and, instead, reports only that she was entitled to a "standardized Director's commission." *Id.*  In her deposition testimony, Plaintiff describes information regarding commission structure and her commission pipeline, which does not dispute or contradict the assertion that McKenna provided Plaintiff with a portion of his commissions. Dkt. 23-1 at 138-144, 148-149. Accordingly, there is no genuine dispute of material fact.

[8] Plaintiff disputed only the portion of the asserted fact pertaining to Plaintiff receiving the same commission that McKenna previously received in the same role. Dkt. 23 at 8. Plaintiff's declaration supports that she did not receive the same commission percentage as McKenna. Dkt. 23-3 ¶ 5. Accordingly, the Court has modified the asserted fact to omit that portion of the asserted fact and there is otherwise no genuine dispute of asserted fact with respect to the remainder of the paragraph.

10. Plaintiff believes that, when she returned from FMLA leave and submitted her timecards, McKenna refused to approve them, denied her the ability to take TIL, and required her to take PTO.  Company policy was "to use any paid leave available during FMLA."[9, 10, 11]

11. During the next year, Plaintiff's performance reviews began to suffer.  Plaintiff attributes her poor performance reviews and McKenna's newfound directness with her to an animus McKenna developed against strong women following his divorce in spring of 2023..[12]

12. Plaintiff testified that the reason McKenna gave her a raise and an excellent performance review, in 2023, was his, in part, "plotting to disguise his hatred of women."[13]

---

[9] Defendant asserts that Plaintiff's timecards were rejected pursuant to a company policy and that McKenna intervened to make sure that the original deal was honored.  Dkt. 20 ¶ 60.  Plaintiff asserts that this is false.  Dkt. 23-3 ¶ 17.  Plaintiff agrees with that the FMLA form accurately reflects company policy, however, that "JSI policy is to use any paid leave available during FMLA."  Dkt. 23 at 22 (citing Dkts. 23-10, 23-11 at 3); *see also* Dkt. 20-18 at 3.  This fact has been modified to reflect the undisputed portion of the fact (which is supported by Bilegan's declaration) and the parties' agreement with respect to company policy.  So modified, there is no genuine dispute of material fact.

[10] Defendant attempts to assert an additional fact but, as Defendant cites no record support, Defendant's assertion is disregarded.  Dkt. 20 ¶ 61.

[11] Defendant further attempts to assert another fact, but it is unclear what fact Defendant is attempting to assert.  Dkt. 20 ¶ 62.  It appears that Defendant is mostly suggesting that Plaintiff was confused about when her next performance review was, but Defendant makes no affirmative statement about when the review took place.  The asserted fact also contains apparent typographical errors ("Ms. McKenna") and the final sentence contains no citation to the record at all.  For all these reasons, whatever Defendant was attempting to assert, it neither appears undisputed nor supported by the record and it is not included here.

[12] Defendant asserts that: "During the next year, Ms. Pattison's performance began to suffer." Dkt. 20 at 3 ¶ 7.  Defendant's citations do not support that Plaintiff's performance suffered – only that her performance reviews suffered.  Dkt. 20-3 at 94-95, 111.  The asserted fact otherwise accurately captures Plaintiff's deposition testimony.  *Id.*  Accordingly, the asserted fact has been modified to reflect that Plaintiff's performance reviews suffered and to what Plaintiff attributed that fact.  Thus, so modified, there is no genuine dispute of fact.

[13] Plaintiff disputes "as to context." Dkt. 23 at 9.  But does not dispute that the asserted fact accurately captures the deposition testimony.  Accordingly, the Court has modified the asserted fact to reflect that this was "part" of the reason for the raise and review and, so modified, there is no genuine dispute of material fact.

13. McKenna did not finalize his divorce until June 2024, after Plaintiff was fired. McKenna characterized the divorce as uncomfortable but not nasty. After his divorce, McKenna made both of the Directors – one male and one female – the role of Vice President.[14]

14. In January 2023, Plaintiff made a presentation to worldwide management in a town hall, focused on her prospect for landing sales contracts. She presented nine identified sales prospects for sales and told leadership that all were certain to be closed as actual sales in the first quarter of 2023. None of them were. Defendant did not get seven of the identified opportunities, and the other two did not materialize until after Plaintiff had been fired. One of those, known as "St. Gabriel," materialized only after the deal changed materially and the funding sources were changed. At the time, Plaintiff said a firm contract in the first quarter of 2023 was certain, the project had been put out for general bids, and the funding source had no money.[15]

15. Accurate reports of what sales are in the "pipeline" and when those sales would materialize are critical. Defendant and its Canadian parent company make financial decisions based on the pipeline, which was impossible under Plaintiff since the company did not have any confidence in the pipeline. Even the Chief Executive Officer of the Canadian parent company questioned the pipeline based on reports by Plaintiff, since it was not realistic.[16]

16. Others began to notice substantial problems with Plaintiff's performance. For example, Lisa Donnan, the Chair of Defendant's Compensation Committee, noticed that, while Plaintiff promised deliverables (such as a strategic plan for Go-to-Market opportunities), Plaintiff did not deliver and never followed up.[17]

---

[14] Plaintiff does not dispute the facts asserted by Defendant. Rather, Plaintiff attempts to dispute their implication, which is not appropriate at this stage. Accordingly, there is no genuine dispute of material fact.

[15] Plaintiff asserts, relying on her declaration, that the opportunities were presented as "on the horizon." Dkt. 23 at 10. Plaintiff's declaration does not use that phrase and, indeed, reiterates the facts asserted by Defendant. Dkt. 23-3 ¶ 9 ("The deals I had in the pipeline during the Global Townhall were all well positioned to close in the next quarter at the time of my presentation."). Accordingly, there is no genuine dispute of fact.

[16] Plaintiff attempts to dispute the asserted fact, by arguing that there were factors outside of Plaintiff's control. Dkt. 23 at 10. Because Plaintiff does not dispute the substance of the asserted fact, there is no genuine dispute of material fact.

[17] Plaintiff attempts to dispute the asserted fact by attacking the credibility of Lisa Mae Donnan, upon whose declaration Defendant relies. Dkt. 23 at 10. Again, this is not appropriate at summary judgment. Moreover, the asserted fact accurately captures Donnan's declaration. Dkt. 20-1 ¶¶ 2, 9. Plaintiff also incorporates by reference her response to another disputed fact – which is inappropriate – to indicate that there were others who did not have a problem with Plaintiff's performance. Dkt. 23 at 10 (referencing her response to paragraph 52). But again, this does not dispute the asserted fact that, at least, Donnan, in addition to McKenna, had a problem with Plaintiff's performance. Accordingly, there is no genuine dispute of material fact.

6

17. Although McKenna's February 28, 2023, performance review meeting said Plaintiff was making "good progress in some areas," he emphasized "[w]e need to land deals" and discussed "the need to improve on process regarding the quality and accuracy of data in sales force and getting to a better timeline."[18, 19]

18. Donnan heard from the Executive Chair of Defendant's Canadian parent company that Plaintiff went directly to the Executive Chair to discuss her desire for a Vice President title. The idea of the title change from Directors to Vice Presidents had support, including from Donnan. Donnan later discussed the idea with McKenna who said that Plaintiff had raised the idea during her February 2023 performance review.[20]

19. McKenna favored the measure and discussed the re-titling with the Board's GSC. Similar-level managers in Canada had received the Vice President title in 2022, under the prior CEO.

20. At around the same time, Donnan, as Chair of the Compensation Committee, became concerned that the weight of McKenna's duties required that he have a direct-report assistant. Donnan and McKenna discussed the idea of having a Chief of Staff. They discussed the issue with other Board members, and Donnan introduced McKenna to a recruiter. At the recruiter's suggestion, in order to broaden the pool of candidates, Defendant changed the title of the position to Executive Vice President. The search

---

[18] Plaintiff attempts to dispute the asserted fact by citing her deposition testimony. In her deposition, Plaintiff concedes that she had a such a meeting during this time period. Dkt. 23-1 at 70:3-6 ("Q: Was that presented during this performance review? A: It would have been around this time. I don't know if it was this exact meeting."). She further testified that she did not know in which exact meeting the points discussed were raised. *Id.* at 71:8-9 ("I don't know exactly which of these points were ascribed to whatever meeting."). As for Plaintiff's suspicion that the notes cited by Plaintiff were modified or manipulated after the fact, Plaintiff relies only on her own speculation and belief. *Id.* at 154:15-18 ("Q: Do you believe that these documents were written contemporaneous to when they were actually alleged to have occurred? A: No."). But a party may not create a genuine dispute of material fact with "[m]ere unsupported speculation." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995). Accordingly, there is no genuine dispute of material fact in this regard.

[19] Defendant attempts to assert an additional fact about events in 2023 but, as Defendant cites no record support, Defendant's assertion is disregarded. Dkt. 20 ¶ 63.

[20] Plaintiff attempts to dispute the asserted fact in reliance on her own declaration. Dkt. 23 at 23. Defendant purports to support the asserted fact based on McKenna's deposition and Donnan's declaration. Dkt. 20 at 20 n. 69. The cited portion of McKenna's deposition is not provided in the excerpts provided to the Court. Dkt. 20-5. Accordingly, the Court relies only on the portions supported by Donnan's declaration. Dkt. 20-1 ¶ 10. Plaintiff's declaration does not relate to or contradict any of the asserted facts. Dkt. 23-3 ¶ 19. Accordingly, as modified, there is no genuine dispute of material fact.

7

continued in April and May 2023, resulting in the candidacy of Greg Cherundolo for Executive Vice President.

21. Meanwhile, the Canadian parent had hired a new CEO, Sacha Gera. This created substantial organizational turbulence. [21]

22. Gera warned that a title of Executive Vice President for Cherundolo, which he had been recruited for, would recreate inconsistency with the Canadian organization, since they had no such position. Gera informed McKenna of this directly. Gera similarly expressed organizational concerns about re-titling Defendant's Directors as Vice Presidents. [22]

23. During this same period, Gera was expressing direct concerns about Plaintiff's executive skills and competence as a leader. [23]

24. Chernudolo was therefore hired as a Vice President rather than as an Executive Vice President, in order to avoid creating a conflict with the Canadian parent so early in Gera's term as CEO. [24]

25. Plaintiff's base salary was increased to $195,000 per year, making Plaintiff one of the highest-paid individuals at Defendant. The commission plan applicable to Plaintiff was also modified to be more favorable to her; she earned about $33,000 in commissions. In

---

[21] Defendant attempts to assert the additional fact that Gera's hiring "had a direct effect on the titles used at JSI." Dkt. 20 ¶ 67. This assertion is not supported by Donnan's declaration, which is the only evidence on which Defendant relies. Dkt. 20-1 ¶ 16. Accordingly, this assertion has been disregarded and there is otherwise no genuine dispute of material fact.

[22] Plaintiff attempts to dispute the asserted fact in reliance on her own declaration's assertions that there was supposed to no Canadian managerial oversight because of Defendant's work with classified information. Dkt. 23 at 24 (citing Dkt. 23-3 ¶ 19). Plaintiff, however, has no personal knowledge that would contradict whether such conversations took place and cannot dispute Donnan's declaration in which she recites that she read the emails between Gera and McKenna. Dkt. 20-1 ¶ 17. Accordingly, there is no genuine dispute in this regard.

[23] Plaintiff attempts to dispute the asserted fact. Dkt. 23 at 24. Donnan's declaration supports that Gera "expressed direct concerns about Ms. Pattison's skills and competence as a leader." Dkt. 20-1 ¶ 17. Plaintiff counters by reciting occasions on which Gera complimented here. Dkt. 23-3 ¶ 20. But that Gera was occasionally complimenting Plaintiff to her face does not mean that Gera was not expressing concerns to Donnan or the Board and Plaintiff would have no personal knowledge of such conversations. Accordingly, there is no genuine dispute of material fact in this regard.

[24] Plaintiff attempts to dispute the asserted fact in reliance on her own declaration's assertions that there was supposed to no Canadian managerial oversight because of Defendant's work with classified information. Dkt. 23 at 24 (citing Dkt. 23-3 ¶ 19). This does not actually dispute Donnan's declaration as to what was actually happening. Dkt. 20-1 ¶ 18. Accordingly, there is no genuine dispute in this regard.

8

addition, McKenna continued voluntarily to split his commissions with her, donating $47,685 to Plaintiff's commission total and retaining $47,685 for himself.[25]

26. The series of performance issues was further exemplified by an April 12, 2023, meeting Donnan arranged with DarkTrace, an important potential partner. The meeting was to be in person, but Plaintiff joined via video. In Donnan's view, during the meeting, Plaintff "exhibited extreme unprofessional and disruptive behavior throughout the meeting: making faces, nodding and shaking her head, crossing her arms, becoming argumentative, and appearing uninterested and distracted. She interjected many times at inappropriate occasions, including trying to answer questions that had been posed to DarkTrace."[26]

27. After the April 12 meeting, Donnan and McKenna spoke frankly about Plaintiff's performance. McKenna admitted that he had been having problems with Plaintiff's performance, but he had been reluctant to communicate them with Plaintiff and was trying to work with Plaintiff to correct them. McKenna noted his "continuing challenges in obtaining accurate sales pipeline data from Ms. Pattison." In particular, they discussed Plaintiff's recurring inaccurate sales forecasting and inaccurate communication of data regarding Product Requirements Definition and Marking Requirements Definition.[27]

28. Despite Donnan's strong commitment to hiring qualified women and minority candidates, Donnan urged McKenna to be decisive and replace Plaintiff and "move on." When

---

[25] Plaintiff attempts to dispute the asserted fact regarding McKenna's diversion of his commissions by reference to a prior paragraph 6, discussed *supra*. Because that prior dispute failed, this dispute also fails. Although Plaintiff asserts that she was aware of "many individuals [who] had salaries in line with (or higher than)" her, Plaintiff's declaration does not dispute that she was "one of" the most highly paid individuals at Defendant as asserted by Defendant. Dkt. 23-3 ¶ 11. And, Plaintiff concedes that the commission rates were improved to be more favorable to her, although she argues that they simply moved back to the rate that McKenna enjoyed. *Id.* (asserting Defendant "simply adjusted my rates back to the rates McKenna enjoyed"). Accordingly, there is no genuine dispute of fact.

[26] Plaintiff attempts to assert the facts related to this meeting with DarkTrace in reliance on her own declaration and by reference to McKenna's deposition. Dkt. 23 at 11-12. Plaintiff's declaration does not dispute that the meeting was scheduled to be in-person but instead asserts that she and others attended virtually. Dkt. 23-3 ¶ 12. Moreover, McKenna's deposition testimony, cited by Plaintiff, supports that the meeting was intended to be in-person. Dkt. 23-7 at 230:11-22 ("It did say in-person meeting."). Finally, the fact that McKenna did not mention Plaintiff's virtual attendance or behavior to her, does not mean that it was not viewed as problematic. Dkt. 20-1 ¶ 12; Dkt. 20-5 at 147. Accordingly, there is no genuine dispute of material fact.

[27] Plaintiff attempts to dispute this asserted fact by reference to another fact. Dkt. 23 at 12. The referenced dispute – to paragraph 11 – relates to whether Plaintiff was accurate with respect to her pipeline. As discussed *supra*, there was no genuine dispute with respect to the asserted facts in paragraph 11. Moreover, Plaintiff nothing that Plaintiff cites disputes what was discussed at this meeting between Donnan and McKenna. Accordingly, there is no genuine dispute of material fact.

9

McKenna indicated his reluctance to fire Plaintiff because Plaintiff said she had imminent sales "wins," Donnan again recommended that he "move on."

29. After April 2023 and continuing throughout the following period, McKenna and Donnan continued to discuss their joint concerns about Plaintiff's performance.  They agreed that Plaintiff was ineffective in managing her team; had not shown any ability to bring in revenue; engaged in poor conduct and often provided little to no substance in return to requests for data or action, with no follow through. McKenna and Donnan were particularly concerned with Plaintiff's inability to realistically assess sales prospects, volume, and timing.[28]

30. Defendant's Board members Alan Wade and Thomas Skinner, as well as two successive Chief Executive Officers of the Canadian parent company, Jason Dupre and Sascha Gera, also expressed concerns to McKenna about Plaintiff's failure to generate revenue.[29]

31. McKenna and Donnan discussed how the Board was becoming concerned "over what appeared to be dropping revenue and sales under Plaintiff.  In Plaintiff's last two full fiscal years as Director of Growth, Defendant's total sales fell to $30 million and $35 million, down from approximately $50 million in each of the two preceding years.  Sales rebounded sharply after Plaintiff left, reaching seventy million dollars for domestic revenue alone, for the part-year period April 2025 through October 2025.[30]

---

[28] Plaintiff attempts to dispute the asserted fact by reference to other facts.  Dkt. 23 at 12.  But none of the referenced paragraphs refer to the same facts as asserted here.  None of the evidence cited by Plaintiff disputes that McKenna and Donnan had these discussions or what the subject those discussions was.  Accordingly, there is no genuine dispute of material fact.

[29] Plaintiff attempts to dispute the asserted fact solely by reference to her own declaration.  Dkt. 23 at 12-13.  But cited portion of the declaration does not refer to a good working relationship with Canadian staff as alleged in Plaintiff's Opposition. *Contrast* Dkt. 23 at 13 (referring to a good working relationship) *with* Dkt. 23-3 ¶ 18 (discussing a plan to allow Defendant to compete with "highly capitalized competitors like Palantir with minimal investment by honing marketing messaging").  Moreover, even if the declaration did refer to such a relationship, it would not dispute or contradict the assertions by Defendant that Canadian officers expressed concerns to McKenna and Donna.  Dkt. 20-5 at 148-149.  Accordingly, there is no genuine dispute of material fact.

[30] Plaintiff attempts to dispute the asserted fact by reference to her own declaration.  The cited portion of Plaintiff's declaration does not, however, purport to contradict the substance of any conversations between Gera and Donnan.  Dkt. 23-3 ¶ 18.  Moreover, Plaintiff would appear to lack personal knowledge to dispute conversations to which she was not a participant.  Finally, Plaintiff asserts that the citation to paragraph of Donnan's declaration is misleading.  Dkt. 23 at 13.  But it is unclear what is misleading.  Donnan asserts that she was concerned about dropping revenue and sales under Plaintiff and discussed the same with McKenna.  Dkt. 20-1 ¶ 15.  The declaration does not impute such concern to Gera here.  Accordingly, there is no genuine dispute of material fact.

32. The function of the Director of Growth position is "fundamentally to grow revenue for the business." Landing deals is the "goal of any growth team."[31]

33. In July 2023, McKenna informed Donnan that he had decided to fire Plaintiff. She agreed this was appropriate. McKenna informed the Board's Government Security Committee ("GSC") in August 2023 of his decision. The GSC was comprised of Donnan, Wade, and Henry Coker, Jr. McKenna also told the Board in August 2023 that he had decided to fire and replace Plaintiff.[32]

34. McKenna decided to terminate Plaintiff for a number of reasons, including a loss of trust in her sales predictions, his view of her unprofessional behavior in meetings, and her inability to close sales.[33]

35. In September 2023, after McKenna had made his decision to fire Plaintiff and had communicated the plan to the GSC and the Board, but prior to her actual termination, Plaintiff approached Bilegan to make a complaint about McKenna.[34]

36. Defendant has an Equal Employment Opportunity ("EEO") and Non-Discrimination Policy. That policy provides that all employment decisions must be made without implicating sex or any other protected category, and designates Bilegan as the point of contact for any complaints. Similarly, Defendant has a Harassment Policy that prohibits harassment based on any factor, sexual or not. The policy has a mandatory reporting requirement: anyone who is aware of any harassment "must report it to his Manager or any

---

[31] Defendant also asserts "Pattison did not" fundamentally "grow revenue for the business." Dkt. 20 at 7. This portion of the asserted fact is not supported by a record citation and so is not included. Plaintiff further objects that she took on functions above and beyond her role but does not dispute that the assertions about her role are correct. Accordingly, there is no genuine dispute of material fact.

[32] Plaintiff attempts to dispute the asserted paragraphs but does so only by citing to her own declaration. Dkt. 23 at 13. That McKenna did not tell Pattison of his decision to fire her, does not contradict Donnan's sworn testimony that Donnan and McKenna and the Board had made these decisions or had these discussions. Accordingly, there is no genuine dispute of material fact.

[33] Plaintiff attempts to dispute the asserted fact but fails to do so. She cites to her own explanations regarding why her sales figures were not better (Dkt. 23-3 ¶¶ 9, 18) and a text from Defendant's Chief Revenue Office Monique Smith who expresses her disappointment in Plaintiff's termination (Dkt. 23-8). Neither the declaration nor the text contradict or dispute Defendant's asserted fact. Accordingly, there is no genuine dispute of material fact.

[34] Plaintiff attempts to dispute "as to chronology" by reference to one of her prior attempted disputes (paragraph 22). Again, Plaintiff's dispute in this regard rests on conversations to which she was not a part (and thus she lacks personal knowledge to dispute them with her own declaration) and she does not point to any other evidence which disputes the existence or subject of the various conversations between McKenna, Donnan, the GSC, and the Board. Accordingly, there is no genuine dispute of material fact.

management with whom he or she feels comfortable." The policy also prohibits retaliation.[35]

37. Bilegan states that Plaintiff "never complained about sex discrimination, sexual harassment, retaliation, or any other conduct based on sex [or] any protected characteristic, ever, by anyone at JSI." Plaintiff testified that she did not raise "sex" in her complaint because Bilegan told her not to mention sex, although she did not remember the exact words, because a sex discrimination complaint would need to be reported outside of Defendant to someone at the customer. Bilegan denies that this happened.[36]

38. In October 2023, Plaintiff submitted a twenty-page complaint makes specific complaints regarding: (i) McKenna's failure to respect time off; (ii) connecting performance reviews to being available outside of normal working hours; (iii) alleged abusive tactics relating to changing expectations, termination threats and reprimands, and withholding of information; (iv) reduction of commissions; and (v) unsupported performance ratings. Dkt. 20-8. The complaint makes reference to harassment, discrimination, abuse, and retaliation but does not explicitly connect such complaints to Plaintiff's sex.[37]

39. When Plaintiff submitted her written complaint to Bilegan, "she insisted that no one else be allowed to see it" other than Bilegan.[38]

40. Bilegan told McKenna that Plaintiff had raised concerns regarding him. McKenna immediately instructed Bilegan to take the matter directly to Board, bypassing McKenna.[39]

---

[35] Plaintiff disputes the inference that Defendant attempts to draw regarding whether its policies were "robust." Dkt. 23 at 14. The Court agrees that this is not an appropriate statement of fact and has omitted the word robust. Accordingly, there is no genuine dispute of fact.

[36] Plaintiff attempts to dispute the asserted fact, but Defendant has accurately captured the variance between Bilegan's and Plaintiff's testimony. Accordingly, there is no genuine dispute as to whether the asserted fact accurately captures this dispute.

[37] Defendant has somewhat unfairly characterized Plaintiff's complaint; the Court therefore modified the asserted fact to comport with the evidence cited. Dkt. 20-8. Plaintiff attempts to dispute the asserted fact but does not cite any contradictory evidence and, instead, inappropriately attacks Bilegan's credulity (which the Court cannot consider at summary judgment). Accordingly, as modified, there is no genuine dispute of material fact.

[38] Plaintiff concedes the fact asserted by Defendant, namely that she told Bilegan not to tell. Dkt. 23 at 15. Plaintiff's assertion of additional information is largely included in the next asserted fact, and accordingly any modification will be made with respect to that fact. But, in any event, despite her attempted dispute, Plaintiff does not actually contradict the asserted fact.

[39] Plaintiff attempts to dispute the asserted fact in reliance on the prior paragraph and her citation to McKenna's deposition testimony. Dkt. 23 at 15. But McKenna's deposition testimony confirms what Defendant has asserted: (i) "Anca Bilegan notified me of a potential issue that Kate might have with me. It wasn't related to sex or harassment or any of that"; (ii) "I immediately told

12

41. Bilegan insulated McKenna from the complaint's contents and substance, since it addressed his management of Plaintiff. Bilegan instead worked with Scott Nadeau, Defendant's Chief Security Officer, and forwarded the complaint to the Board' GSC and the Board hired Miles & Stockbridge to investigate.[40]

42. Bilegan did not give a copy of Plaintiff's complaints, or Plaintiff's supplementary submissions, or any oral briefing as to the substance of the complaint, to McKenna. She did not allow McKenna to see a copy of the written complaints or the Miles & Stockbridge reports until well after Plaintiff was terminated. At no time either before or after Plaintiff's termination did Bilegan tell McKenna that Plaintiff's concerns involved sex or any other protected activity.[41]

43. McKenna confirmed that he did not know that the complaint against him implicated any question of sex, gender, or otherwise unlawful discrimination, until well after Plaintiff was terminated. McKenna did not even learn about the general nature of the complaint until Plaintiff had been fired and had filed her Charge with the Equal Employment Opportunity Commission (the "EEOC").[42]

44. Miles & Stockbridge is a large, multi-state law firm with a robust employment-law practice. Over the course of their investigation, the lead attorney, Sasha E. Hodges-Wren, reviewed the written complaint and "all written supplements and documents provided by Ms. Pattison." The firm interviewed McKenna, Greg Cherundolo (Defendant's then-Vice President), Donnan, Earl Hewitt (Director of Operations), Andrea Hodges (Director of Services), Bilegan, and four other employees, including three from Plaintiff's team. The firm also interviewed Plaintiff three times. The investigation took about a month.

---

Anca . . . [i]f it involves me, you and Scott need to get together. And if there is a complaint against me as the president, you need to go to the board of directors."; and (iii) when asked if Bilegan told Mckenna what the complaint was about, Mckenna stated "She didn't say." Dkt. 23-7 at 126-127. Accordingly, there is no genuine dispute of material fact.

[40] Plaintiff attempts to dispute the asserted facts, but again relies on McKenna's deposition testimony, which only supports the asserted fact. Dkt. 23 at 15. Plaintiff and Defendant dispute whether Miles & Stockbridge is a "respected law firm," but such characterization is immaterial and has been removed. Accordingly, there is no genuine dispute of material fact.

[41] Plaintiff attempts to dispute the asserted facts, again in reliance on McKenna's deposition testimony, which only supports the asserted fact. Dkt. 23 at 16. Accordingly, there is no genuine dispute of material fact.

[42] Plaintiff attempts to dispute the asserted facts, repeating the same argument as discussed *supra*. Dkt. 23 at 16. Accordingly, there is no genuine dispute of material fact.

Defendant waived its attorney-client privilege to the reports and produced them in discovery.[43, 44]

45. Since the written complaints never referred to sex or any protected category – even the final supplement submitted by Plaintiff in November 2023 – Hodge-Wren expressly asked Plaintiff whether she believed the conduct was motivated by some protected characteristic. Plaintiff told Hodge-Wren that she believed she was treated differently because of her gender. She did not make any reference to the fact that she had taken FMLA leave as a factor. Accordingly, the Miles & Stockbridge team investigated whether sex or gender played any role in any of the concerns Plaintiff raised. "[A]fter a review of all the available evidence, the investigation concluded that Ms. Pattison was not being treated differently because of her gender, and no evidence was found to substantiate that claim." Further, "[t]he investigation did not find that Ms. Pattison had been subjected to retaliation for filing her complaint, because there were legitimate business reasons for the Company's actions she complained of."[45]

46. The law firm's conclusions were embodied in a report to Nadeau dated November 7, 2023, and – after another supplemental complaint by Plaintiff, where "[n]one of the submissions asserted sex, or any other type of protected category, as the basis for any of her complaints" and "[n]one of the submissions changed the prior conclusions" – an Addendum to Nadeau dated November 10, 2023. The investigation concluded that: "[T]he facts uncovered in this investigation do not demonstrate that Ms. Pattison has suffered any form of discrimination or harassment based on gender or any other protected class . . . . Rather, it appears that Ms. Pattison's concerns arise from disagreements about business issues and how they are being handled . . . . The investigation shed light on serious tensions and interpersonal disputes in the office between employees and their superiors . . . . However, ultimately, Ms. Pattison was treated the same as Mr. Hewett, the other individual in a similar situation."[46]

---

[43] Plaintiff attempts to dispute the asserted facts but cites no evidence relevant to the asserted facts. Dkt. 23 at 16. Accordingly, there is no genuine dispute of material fact.

[44] Plaintiff successfully disputes an assertion by Defendant regarding whether the GSC interviewed Plaintiff regarding her complaint. Defendant cites evidence from Donnan suggesting that Plaintiff was interviewed by them. Dkt. 20 ¶ 34. Plaintiff cites her own declaration which asserts that the GSC did not interview her regarding her complaint. Dkt. 23-3 ¶ 22. Accordingly, there is a genuine dispute in this regard and is not included in the recitation of facts. This dispute does not appear to be material, however.

[45] Plaintiff attempts to dispute the asserted fact but cites no evidence in this regard. Instead, Plaintiff makes legal arguments which are not appropriate with respect to whether a fact is supported. Accordingly, there is no genuine dispute of material fact.

[46] Plaintiff attempts to dispute the accuracy of the investigation report, but she does not dispute that the asserted fact is what the investigation report *found*. Dkt. 23 at 16. Accordingly, there is no genuine dispute of material fact.

14

47. This is consistent with McKenna's testimony that he held all of his Directors to the same standard.[47]

48. The firm reported its conclusion to Plaintiff by letter dated November 10, 2023. "[W]e did not substantiate your allegations of harassment or discrimination and specifically we did not find that Mr. McKenna harassed or discriminated against you based on any protected characteristic. Further, we could not substantiate the claim that Mr. McKenna retaliated against you for filing a claim with Human Resources."[48]

49. Donnan was also the Chair of the Board's Compensation Committee, which provided oversight and review of Defendant's compensation decisions. Part of the role of the Compensation Committee is to ensure that no disparities occurred based on irrelevant or illegitimate criteria such as race or sex. In this role, Donnan reviewed and approved all compensation. Donnan is confident that Defendant did not have any unlawful compensation, "particularly in the case of Ms. Pattison."[49, 50]

50. Plaintiff's background is academic and largely in consulting. She has an undergraduate degree from American University in international relations and a master's from Johns Hopkins in global security strategy. She has done other coursework, notably at the Kennedy School of Government in Dubai focusing on the political economy of oil. Her private sector experience was at Securicon and Ernst and Young selling largely services and not products. She describes her "sweet spot" as consulting and advising. She left her prior job to come to Defendant because her prior job was "back office" rather than fieldwork.[51, 52]

---

[47] Plaintiff disputes the accuracy of the contention that McKenna treated his Directors the same; but that is not the fact asserted by Defendant. Dkt. 23 at 17. Defendant merely asserts that the investigation and McKenna's testimony are consistent, which is not disputed. Accordingly, there is no genuine dispute of fact.

[48] Plaintiff attempts to dispute the accuracy of the investigation's findings but does not dispute that this is what the investigation found. Dkt. 23 at 17. Accordingly, there is no genuine dispute of material fact.

[49] Plaintiff attempts to dispute the asserted fact but cites no evidence in the record. Dkt. 23 at 17. Accordingly, there is no genuine dispute of material fact.

[50] Defendant asserts: "None of the individuals to whom Ms. Pattison points as a 'comparator' for comparison purposes was comparable to her while she was at JSI." Dkt. 20 at 13. This is a legal conclusion and not appropriate for the statement of facts.

[51] Plaintiff asserts a dispute with respect to this fact, but does not dispute any of the information about her background. Accordingly, there is no genuine dispute of material fact in this regard.

[52] Defendant asserts a number of facts about how Plaintiff's degree relates to her role. Dkt. 20 at 13-14 ¶ 42. Although Defendant purports to be quoting from some piece of evidence, Defendant

15

51. With respect to Earl Hewitt, he retired at the end of 2025 as Vice President of Customer Operations and, according to Bilegan, the position was "in no way comparable to the position Ms. Pattison held at JSI." Although they both held Director titles, the jobs were very different. Hewitt had no responsibility for sales. He was responsible for technical support, training, program management, and essentially all of the post-sale operations.[53]

52. Hewitt's position did not permit him to earn commissions. At the time Pattison was fired, her base salary was $195,000 while Hewitt's – who had been with Defendant for many more years – had a base salary of $222,000. But due to commissions (including those from McKenna), Plaintiff earned $276,000 in her last year.[54]

53. Defendant's largest customer is the U.S. Drug Enforcement Administration (the "DEA").

54. Plaintiff's role as Director of Growth is now filled by Rob Patterson. He was hired in October 2024, about eleven months after Plaintiff was fired.[55]

55. Gera left Defendant in October 2024. In that month, the two existing Directors (one male and one female) had their titles changed to Vice President, and Patterson had his title modified to Vice President of Growth. On the same day, Cherundolo had his title changed to Executive Vice President.[56]

---

failed to cite any record evidence. Accordingly, the asserted fact is not properly asserted for purposes of Rule 56 and is not included here.

[53] Plaintiff attempts to dispute the facts asserted regarding Hewitt's role in reliance on her own declaration. Dkt. 23 at 18. Plaintiff's declaration, however, merely recites that sometimes McKenna scheduled meetings with both Plaintiff and Hewitt and sometimes McKenna and Hewitt deferred to her suggestions regarding an issue. Dkt. 23-3 ¶ 24. Such assertions do not dispute the asserted fact. Accordingly, there is no genuine dispute of material fact.

[54] Plaintiff attempts to dispute the facts asserted in reliance on the same paragraph in her declaration previously discussed. Dkt. 23 at 18; Dkt. 23-3 ¶ 24. It does not dispute the asserted fact and, accordingly, there is no genuine dispute of material fact.

[55]Defendant also asserted that, in October 2024, "the titles of all Directors were changed to Vice President." Dkt. 20 ¶ 14. Plaintiff disputes this portion of the asserted fact and, although Plaintiff relies on no record evidence to support her dispute, a review of the record evidence cited by Defendant demonstrates that it does not support the asserted fact. Indeed, although Bilegan's declaration – the only evidence cited by Defendant – notes that Patterson was a Vice President, it does not indicate that all directors were given the Vice President title. Dkt. 20-2 ¶ 19.

[56] Plaintiff attempts to dispute the asserted fact in reliance on her own declaration. Dkt. 23 at 24 (citing Dkt. 23-3 ¶ 19). The cited portion of Plaintiff's declaration does not relate to the facts asserted by Defendant, which are supported by Bilegan's declaration. Dkt. 20-2 ¶ 25; Dkt. 31-1 ¶ 7.

16

56. These were changes in title only, and were always intended to be a change in title, as duties, compensation, and all else remained the same.[57]

57. Patterson's starting salary, which has not been increased to date, was a base of $200,000 per year, compared to Plaintiff's base of $195,000 per year – a year earlier.[58]

58. Patterson came to Defendant after servicing for decades in the DEA, Defendant's largest customer. Patterson was previously the Administrator for DEA, the head of the agency, responsible for all DEA operations worldwide. Immediately before joining Defendant, Patterson spent six years at AT&T directing product and revenue growth under a $100 billion contract very successfully. Additionally, Patterson had three decades of familiarity with Defendant's product, its use, and Defendant's customer.[59]

59. Additionally, after seeing eight-figure declines in yearly sales under Plaintiff, Patterson more than doubled yearly revenue in his first year-and-a-half. With the exception of a single project – which in fact pre-dated Plaintiff, none of these new sales are due to clients for which Plaintiff performed work. Patterson also crafted and implemented a plan that ensured revenue during the government shutdown.[60]

60. There is a $5,000 difference between Plaintiff's base salary at the time she was fired and Patterson's base salary, but Patterson's commission plan is less favorable to him than the 2023 commission plan under which Plaintiff worked.[61]

---

[57] Plaintiff attempts to dispute the asserted fact but cites to no portion of the record. Dkt. 23 at 24. Accordingly, there is no genuine dispute of material fact.

[58] Defendant asserted additional information that was an inappropriate conclusion and characterization which has been removed from the asserted fact. Dkt. 20 ¶47. Although Plaintiff attempts to dispute the asserted fact, she only does so "as to context," which is not an appropriate dispute. Dkt. 23 at 18. Accordingly, there is no genuine dispute of material fact.

[59] Defendant asserted additional information that was an inappropriate conclusion and characterization which has been removed from the asserted fact. Dkt. 20 ¶48. Plaintiff responds to dispute with similarly inappropriate conclusions and characterizations. Dkt. 23 at 18. Because the disputed conclusions have been removed, there is no genuine dispute of material fact.

[60] Plaintiff attempts to dispute the asserted fact in reliance on her declaration. Dkt. 23. But Plaintiff's declaration (Dkt. 23-3 ¶ 15) does not address the facts asserted by Defendant. Furthermore, to the extent Plaintiff argues that "Patterson was not even working for JSI during the government shutdown"(Dkt. 23 at 19), the Court takes judicial notice that the last government shutdown was from October to November 2025 and notes that the facts previously established that Patterson was hired in October 2024 and remains employed by Defendant. Accordingly, there is no genuine dispute of material fact.

[61] Plaintiff attempts to dispute the asserted fact, but cites to no evidence in the record with respect to the commission structure. Dkt. 23 at 19. The asserted fact is supported by the deposition testimony of Greg Cherundolo, exception for Defendant's assertion that "Mr. Patterson's base salary

17

61. Greg Cherundolo was hired in August 2023, three months before Plaintiff was fired, and he is an additional layer of management between the three Directors and McKenna. Both the title and overall nature of the role changed during the few months before he was hired. Cherundolo was hired to be Plaintiff's boss.[62]

62. Additionally, although half of Plaintiff's sales team complained that they had not seen her in months, Cherundolo was noted for being responsive and communicative. [63]

63. Before Plaintiff came to Defendant, Cherundolo had used Defendant's equipment in the field, as a customer, since 1992. He also spent decades in positions of increasing responsibility at Defendant's largest customer, the DEA. His final position at the DEA was Chief of Operations, where he oversaw the impact and effectiveness of all DEA operations domestically and in 69 foreign countries. He managed the DEA Operations budget, which substantially exceeded a half-billion dollars.[64]

64. In Cherundolo's first year he had a salary of $250,000 and a bonus of $50,000 compared to Plaintiff's salary of $276,000. Cherundolo's base salary remained unchanged at $250,000 for three years, he received a single bonus of $10,000 since his first year, and he

---

is indistinguishable from Ms. Pattison's." *Contrast* Dkt. 20 ¶ 50 *with* Dkt. 20-6 at 148. Cherundolo actually testified that "most of [the salary] is the same. Dkt. 20-6 at 148. Accordingly, with this modification, there is no genuine dispute of material fact.

[62] Plaintiff attempts to dispute the asserted fact, but does not cite any evidence in the record. The asserted fact is supported by Bilegan's declaration. Dkt. 20-2 ¶ 21. Accordingly, there is no genuine dispute of material fact.

[63] Plaintiff attempts to dispute the asserted fact that Cherundolo was responsive to subordinates and Plaintiff was not. Defendant properly relies on McKenna's deposition in this regard and McKenna specifically named two individuals in particular who he asserted had difficulties. Dkt. 20-5 at 117, 198; Dkt. 23-8 at 198, 230-31. Plaintiff points to two other employees that were satisfied with Plaintiff's responsiveness. Dkt. 23-5 at 10-13; Dkt. 23-6 at 15-17. Plaintiff's reliance on these depositions does not dispute the asserted fact that half of her subordinates had difficulties. Accordingly, there is no genuine dispute of fact in this regard.

[64] Plaintiff attempts to dispute Defendant's asserted facts in two respects. First, Plaintiff challenges whether Cherundolo was using Defendant's equipment based on his LinkedIn profile. Dkt. 23 at 20 (citing Dkt. 23-9). But Cherundolo's deposition testimony clearly says that he used Defendant's equipment going back to 1992. Dkt. 20-6 at 43. The deposition testimony does not link such experience to a role at the DEA. Thus, the fact that Cherundolo's LinkedIn profile lists him as working as a detective does not contradict his deposition testimony and there is no genuine dispute in this regard. Second, Plaintiff challenges Defendant's assertion that: "In those roles, [Cherundolo] was a leader in all aspects of operations, not just sales, but in running a large business, building and having deep relationships with customers and potential customers, expertise in technical support, and extensive experience in training." Dkt. 20 ¶53. Defendant cites page 106 of McKenna's deposition in this regard, but such page reference was not included in the deposition excerpts. Dkt. 20-5. Thus, the assertion is unsupported and has been removed from the undisputed facts.

is ineligible for commissions. Thus, Cherundolo is making less than Plaintiff did in her final year.[65]

65. Plaintiff's firing left Defendant without a Director of Growth/Sales. Defendant searched for a replacement for her, and Cherundolo undertook oversight of her five to seven employees "on an emergency basis" and, when he had the time, McKenna also oversaw them. Cherundolo also had to perform his other duties, involving all of the non-sales operations of Defendant.[66]

66. McKenna identified Kevin Atkins, Director (and later, Vice President) of Growth for the Canadian parent of Defendant. Atkins made less than half of what Plaintiff did: he was making a base salary of $101,000 a year when she started and $120,000 when she was fired.[67]

67. Plaintiff seeks an award for emotional distress damages on those claims.

68. Plaintiff has a long history, predating her association with Defendant, of anxiety disorder, depression, ADHD, and poor sleep patterns.[68]

69. Plaintiff has been taking, and continues to take, long before her association with Defendant multiple psychoactive and other medications.[69]

70. Plaintiff has been seeing a psychiatrist since before she came to Defendant and continues to see this psychiatrist regularly.[70]

---

[65] Plaintiff disputes the relevance of the asserted fact but does not dispute the fact itself. Accordingly, there is no genuine dispute of material fact.

[66] Plaintiff attempts to dispute the asserted fact by relying on McKenna's deposition testimony. Dkt. 23 at 21. But Plaintiff failed to include the cited page in the excerpts of McKenna's deposition that she attached as an exhibit. Dkt. 23-7. Defendant's asserted fact is supported by Bilegan's declaration. Dkt. 20-2 ¶ 16. Accordingly, there is no genuine dispute of material fact in this regard.

[67] Plaintiff attempts to dispute the asserted fact by incorporating her response to a prior asserted fact. Dkt. 23 at 21. But that prior response cited to no relevant record evidence addressing the facts asserted here. Accordingly, there is no genuine dispute of material fact in this regard.

[68] Plaintiff attempts to dispute the asserted fact, but her response concedes such information. Dkt. 27. Accordingly, there is no genuine dispute of material fact.

[69] Defendant attempts to assert additional information about the "side effects" of such medications. Dkt. 20 ¶ 75. Such additional information is not supported by the record evidence that Defendant cites. Dkt. 21-2. Accordingly, that information has been disregarded and there is no genuine dispute of material fact.

[70] Plaintiff attempts to dispute the asserted fact only as "to context." Dkt. 27. This does not dispute the asserted fact. Accordingly, there is no genuine dispute of material fact.

71. Plaintiff discussed her work experiences, allegations of harassment and her allegations of discrimination with her psychiatrist. [71]

72. Plaintiff asserts that she can distinguish between her symptoms caused by Defendant and those caused by her underlying conditions and she feels "it's probably something of a low-grade PTSD." [72]

73. Plaintiff has not designated an expert witness in this case. [73]

74. At her deposition, Plaintiff was asked for the name of her General Practitioner ("GP"), and could not remember it. Her counsel said, "We can provide this. That's something we'll need to follow up with if she can't remember." Plaintiff testified she had seen "a couple of different practitioners there" (at Medstar) and that "I would go to Medstar, and I went to . . . Virginia Hospital Center general practice prior to that."

75. Plaintiff later testified that she had only been to a General Practitioner once. Although Plaintiff said she did not have a GP before that, and the records reflect that the purpose of her visit was to establish a new GP relationship, she testified "I've seen doctors all my life."

76. At deposition, Plaintiff's counsel stated: "We didn't have any medicals, so I would have to follow up with her, and she would have to follow up with her doctor to get that." Counsel for Defendant then held the deposition open pending receipt of the medical records.

77. By agreement of counsel, the parties agreed to conclude Plaintiff's deposition as to medical and financial records on October 21, 2025 – after the close of discovery, a month after the deposition began, and almost two months after Defendant served its document requests on August 22, 2025.[74]

---

[71] Plaintiff attempts to dispute the asserted fact only as to the "inference" that could be drawn. Dkt. 27. This does not dispute the asserted fact. Accordingly, there is no genuine dispute of material fact.

[72] Plaintiff attempts to dispute the asserted fact simply repeats the same information asserted by Defendant. Dkt. 27. Accordingly, there is no genuine dispute of material fact.

[73] Defendant attempts to assert two additional facts relating to discovery. Dkt. 20 ¶¶ 80, 81. Defendant fails to cite to any portion of the record, however, and so the asserted facts have been disregarded.

[74] Although Defendant improperly failed to support the asserted fact with any citation to the record(Dkt. 20 ¶ 85), Plaintiff largely agrees with the assertion of fact except for the suggestion that this change was due to Plaintiff's schedule, which has been removed (Dkt. 27 at 24). Accordingly, there is no genuine dispute of material fact.

78. The evening before, Plaintiff produced additional documents: three pages of medical documents, a two-page record bearing the name of a Medstar doctor she never saw, and a one-page summary from her Psychiatrist prepared the day before.[75]

## III.  LEGAL STANDARD

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986).  The party seeking summary judgment has the initial burden to show the absence of a material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The facts shall be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party.  *Anderson*, 477 U.S. at 255.  "(A) party opposing summary judgment may not simply rest on the allegations of his complaint, but must instead come forward with specific evidence showing the existence of a genuine issue of fact."  *Muhammad v. Giant Food*, 108 F. App'x 757, 764 (4th Cir. 2004) (citing *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991)).

## IV.  ANALYSIS

Plaintiff's Complaint asserts the following claims against Defendant: (i) sex discrimination in violation of the Virginia Human Rights Act (the "VHRA") and Title VII of the Civil Rights Act of 1964 ("Title VII"); (ii) pay discrimination in violation of Title VII, the Lilly Ledbetter Fair Pay Act of 2009 (the "FPA"), the Equal Pay Act of 1963 (the "EPA"), and the VHRA; (iii) retaliation in violation of Title VII and the VHRA; and (iv) FMLA retaliation.  Dkt. 1.  Defendant seeks the entry of summary judgment in its favor on all counts.  The Court first determines how these claims can be grouped and then analyzes each group of claims in turn.

---

[75] Plaintiff does not dispute the asserted fact, except it being "out of context," rather, she argues that Defendant could have subpoenaed medical records from the providers directly.  Dkt. 27 at 24. Thus, despite Defendant only citing to the medical records themselves, there is no genuine dispute in this regard.

A.  Grouping of Claims

As an initial matter, the Court notes that Plaintiff has asserted counts that include overlapping claims – *i.e.* claims for sex discrimination under the VHRA and Title VII or claims for pay discrimination under Title VII, the FPA, the EPA, and the VHRA.  *First*, the Court will analyze Plaintiff's Title VII and VHRA claims together, as the two laws use substantially identical language.  *See, e.g.*, *Rose-Stanley v. Virginia*, 2015 WL 6756910, at *4 (W.D. Va. Nov. 5, 2015) (noting that, because plaintiff "has not stated any viable claim under federal law, she cannot claim an unlawful discriminatory practice under the VHRA"); *see also McCarty v. City of Alexandria*, 2024 WL 5081956, at *4 (E.D. Va. Dec. 11, 2024) (recognizing that Title VII and VHRA claims are analyzed together "because Title VII and the VHRA use substantially identical language").  *Second,* the "FPA does not provide a separate statutory cause of action." *Hughes v. Xerox Corp.*, 37 F. Supp. 629, 644 (W.D.N.Y. 2014); *see also Burnett v. Combined Veterans Ass'n*, 2019 WL 13293919, at *2 n.1 (S.D. Ill. Feb. 13, 2019) ("The Lilly Ledbetter Fair Pay Act of 2009 does not provide a separate cause of action, but simply amends Title VII."); *Pittman v. Sunland Ctr., Fla. Agency for Persons with Disabilities*, 2019 WL 13140744, at *3 (N.D. Fla. June 4, 2019) (noting that "the Lilly Ledbetter Fair Pay Act ('LLFPA') does not create an independent cause of action, separate and apart from Title VII").  With this framework in mind, the Court turns to the Motion's merits.

B.  Sex Discrimination

A sex discrimination claim is generally analyzed within the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  Where, as here, a plaintiff does not rely on direct evidence of discrimination, she needs to demonstrate a *prima facie* case of discrimination: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse

employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) (citing *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004)), *aff'd sub nom. Coleman v. Ct. of Appeals of Md.*, 566 U.S. 30 (2012). If a plaintiff establishes a *prima facie* case of discrimination, then the defendant has an obligation to produce a legitimate, non-discriminatory reason for its actions and, if so, the burden shifts back to Plaintiff to establish pretext. *See Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 650 (4th Cir. 2021). An employer's burden is only to "articulate" a legitimate, nondiscriminatory reason and is a burden of production. *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007). A plaintiff may then produce evidence that the employer's justification is "unworthy of credence" or that there is other circumstantial evidence sufficiently probative of discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 147 (2000). As the Fourth Circuit has instructed, "the core of every Title VII case remains the same, necessitating resolution of the ultimate question of discrimination." *Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244, 255 (4th Cir. 2025) (internal citations and quotations omitted).

Although both parties acknowledge the applicable *McDonnell Douglas* framework, they again make this Court's analysis more difficult by not squarely making their arguments within it or fully developing what their arguments are. Ultimately, Defendant challenges: (i) Plaintiff's asserted adverse employment actions; (ii) whether Plaintiff was meeting Defendant's legitimate expectations; and (iii) whether Plaintiff has identified similarly situated comparators. Dkt. 20 at 24-25 (arguing "[m]of what is in the Amended Complaint has been shown to be just plain wrong," challenging Plaintiff's identified adverse employment actions, and asserting that Plaintiff was not meeting legitimate expectations); Dkt. 31 at 12-15 (challenging treatment compared to others,

23

whether met legitimate expectations, and whether vice presidential title was an adverse action). The Court analyzes each aspect of the *prima facie* case challenged by Defendant.

### i. Adverse Employment Actions

Plaintiff identifies the following as her adverse employment actions: (i) she was paid less than Cherundolo and Patterson; (ii) when Defendant made her take on more work than her male counterparts; (iii) when she was excluded from meetings; (iv) when she was denied commissions; (v) when she was demoted and Cherundolo and Patterson were promoted; (vi) when she was terminated; and (vii) when she was forced to use vacation time instead of TIL leave. Dkt. 23 at 29. The majority of these asserted adverse employment actions are not supported by the record. The ones that are supported are that: (i) she was paid less than Cherundolo and Patterson and (ii) she was terminated.

To begin with, Plaintiff's Opposition fails to point to any evidence in the record suggesting that Plaintiff was excluded from meetings in which she otherwise should have taken part. *See generally* Dkt. 23. Indeed, other than the conclusory references in argument to Plaintiff being left out of meetings, the "meetings" referenced in the Opposition are: (i) Plaintiff's 2023 review meeting, which she attended; (ii) the town hall meeting, at which she presented; (iii) the meeting with DarkTrace, which she attended; and (iv) that Plaintiff "regularly scheduled meetings with her staff." Dkt. 23. Plaintiff fails to identify any specific meetings from which she was excluded. Indeed, a review of Plaintiff's entire declaration fares no better, as the only references to meetings there are: (i) the DarkTrace meeting, which Plaintiff attended; and (ii) that McKenna "regularly scheduled meetings with Hewitt and myself." Dkt. 23-3. As Plaintiff's conclusory argument regarding exclusion from meetings is not supported by citations to the record, Plaintiff has not

24

established any genuine dispute of fact in this regard.  Accordingly, there is no evidence on this summary judgment record that Plaintiff was excluded from meetings.

Next, Plaintiff asserts that she was made to take on more work than her male colleagues. But Plaintiff does submit any evidence that Defendant *made* or *required* her to take on additional work outside her scope of work.  Rather, Plaintiff asserts: "Pattison earned her excellent performance review and bonus by doing a considerable amount more than was in her job description and contributing more than others."  Dkt. 23 at 9.  Indeed, her testimony at deposition was not that she was made do more but that she was "contributing a good bit more than others," that McKenna noticed, and that he "couldn't do anything about it."  Dkt. 23-1 at 69.  In any event, Plaintiff's declaration and deposition testimony is conclusory as to *what* more she was doing and *how* it was beyond what was expected from her in her job description.  *See Altemus v. Fed. Realty Inv. Trust*, 490 F. App'x 532, 536 (4th Cir. 2012) (rejecting the plaintiff's attempt to create an issue of material fact through a "self-serving affidavit [that] was unsupported by the record"); *Guthrie v. Blue Ridge Sav. Bank*, 159 F. Supp. 2d 903, 909 (W.D.N.C. 2000) (holding that "speculative assertions," "conclusory statements," and "unsupported allegations" "do not confer talismanic immunity from Rule 56").  Here, Plaintiff's assertions that she contributed more, although made under oath, do not provide information sufficient to establish that: (i) anything she contributed was outside of her job description; or (ii) she was forced to do the alleged extra work. Accordingly, there is no evidence in the summary judgment record to establish that Plaintiff suffered an adverse employment action in this regard.

Plaintiff also asserts that she was "denied commissions."  But, again, Plaintiff's Opposition points to no commissions to which she was entitled that she did not receive.  The only record evidence that Plaintiff points to regarding the asserted denial of commissions is given in terms of

a hypothetical.  Dkt. 23-1 at 140:16 ("So, I'll answer in a hypothetical.").  In her deposition testimony (but not her Opposition), Plaintiff further suggests that the way in which McKenna attributed commissions was "in violation of policy," but Plaintiff never identifies any specific policy that was violated.  A review of Plaintiff's declaration suggests that, in her first year as Director, Plaintiff did not submit requests for commissions, because any commissions earned stemmed from McKenna's work.  Dkt. 23-3 ¶ 4.  Further, Plaintiff asserts that commissions generally had a "standard process" that was followed until her last commission cycle, where she asserts that her commissions were reduced by fifty percent because she was told she was not eligible for commissions earned by Jorge Rodriguez.  *Id.*  But again, Plaintiff points to no evidence in the record suggesting that she was entitled to commissions for deals that Rodriguez closed.  Plaintiff further claims that Marshall Grenier previously served in a similar role and that McKenna had collected commissions based on his deals but does not establish how she has personal knowledge with respect to this issue.[76]  Accordingly, there is no evidence in the summary judgment record to establish that Plaintiff suffered an adverse employment action in this regard.

With respect to her alleged demotion, Plaintiff points to no information in the record supporting the proposition that she was demoted.  Indeed, her own declaration does not mention the word demoted or demotion.  Dkt. 23-3.  Based on the summary judgment record, it appears that Plaintiff was at all times the Director of Growth, the undisputed facts reflect that Plaintiff was

---

[76] *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge . . . ."); *see Latif v. The Cmty. Coll. of Balt.*, 354 F. App'x 828, 830 (4th Cir. 2009) (affirming district court's grant of summary judgment, noting plaintiff's affidavit, which offered conclusions not based on his own knowledge, did not create genuine issues of material fact); *Lyansky v. Coastal Carolina Univ.*, 2024 WL 3892540, at *2 (D.S.C. May 21, 2024), *report and recommendation adopted*, 2024 WL 3891183 (D.S.C. Aug. 21, 2024) ("A party cannot create a genuine issue of material fact solely with conclusions in his or her own argument, affidavit, or deposition that are not based on personal knowledge.").

26

promoted to be Director of Growth on August 1, 2021, that her termination in 2023 left Defendant without a Director of Growth, and that Patterson (hired in 2024) became the new Director of Growth. Accordingly, there is no basis in the record for Plaintiff's claim of demotion. To the extent that Plaintiff asserts that she should have been given the title of Vice President, Plaintiff points to no evidence in the record that any individual at Defendant had the role of Vice President during her tenure with Defendant. Rather, the undisputed record on summary judgment is that no individual with Defendant was titled as Vice President until after she was terminated. Thus, Plaintiff's argument that Defendant "promot[ed] two lesser qualified males (Cherundolo & Patterson) over her to Vice President roles" that argument merges with her termination argument, because at the time of their assumption of the role of Vice President, Plaintiff was no longer employed by Defendant. Dkt. 23 at 29.

Finally, Plaintiff argues that she suffered an adverse employment action when she was required to use PTO instead of TIL for the last four weeks of her FMLA leave. But taking as true Plaintiff's characterization of the events regarding her leave (that McKenna originally approved and then rejected the use of TIL), Plaintiff acknowledges that Defendant's policy was "to use any paid leave available during FMLA." Dkt. 23 at 22 (citing the Employee Handbook and the FMLA Form). Thus, Plaintiff has not established an entitlement to use TIL leave and, in the absence of such entitlement, Plaintiff cannot establish that she suffered an adverse employment action. *See Milczak v. Gen. Motors, LLC*, 102 F.4th 772, 786 (6th Cir. 2024), *reh'g denied sub nom. Milczak v. Gen. Motors, LLC*, 2024 WL 3205990 (6th Cir. June 17, 2024) ("The same is true of Milczak's complaint that he did not receive a reward for his cost-cutting suggestions. GM paid Milczak $300 for one idea; he says it should have been $25,000 under GM's policy for rewarding employees that create cost-saving measures. But, again, nothing beyond his own testimony shows that he was

27

entitled to a $25,000 award."); *Felder v. Bradford Health Servs.*, 2009 WL 10669963, at *11 (N.D. Ala. Nov. 23, 2009), *aff'd*, 493 F. App'x 17 (11th Cir. 2012) (finding no adverse employment action for "[t]he denial of reimbursement, especially when it is undisputed that she did not follow the procedures set out in the Employee Handbook to obtain reimbursement").

## ii. Legitimate Expectations

The Fourth Circuit recognizes that, in assessing whether an employee is meeting legitimate expectations, the employee must adduce evidence "that he was doing his job well enough to rule out the possibility that he was fired for inadequate job performance, absolute or relative." *Miles v. Dell, Inc.,* 429 F.3d 480, 488 n. 5 (4th Cir.2005) (citation omitted). In determining whether Plaintiff met her legitimate job expectations, the Court may consider only statements elaborating on what the employer's expectations were, and analyses of whether Plaintiff met them. Evaluations speaking to an employee's qualifications have no bearing on the analysis because "[a]n employee may be qualified when hired, but could fail either to maintain his qualifications or, more commonly, to meet his employer's legitimate expectations for job performance.'" *Warch v. Ohio Cas. Ins. Co.,* 435 F.3d 510, 515 (4th Cir.2006). Generally, the "Plaintiff's own perception of her job performance cannot create an issue of fact on this element." *Evans v. Technologies Applications & Serv. Co.,* 80 F.3d 954, 960–961 (4th Cir. 1996). Moreover, "coworkers' fact testimony cannot build a prima facie case for [Plaintiff]." *King v. Rumsfeld,* 328 F.3d 145, 150 (4th Cir. 2003) (finding that co-teachers' testimony was insufficient to establish that teacher was meeting employer's expectations); *see also Hawkins v. PepsiCo, Inc.,* 203 F.3d 274, 280 (4th Cir. 2000) ("The alleged opinions of Hawkins' co-workers as to the quality of her work are similarly 'close to irrelevant.'").

Here, there is substantial evidence in the record that Plaintiff was not meeting her employer's legitimate expectations. Although the parties agree that in spring 2023, Plaintiff received a good performance review, the evidence in the record reflects that McKenna raised concerns regarding Plaintiff's ability to land deals and that sales and pipeline needed improvement. Dkt. 20-13. Donnan and Wade each submitted declarations which further support concerns regarding sales and pipeline figures. Dkt. 20-1 ¶¶ 9, 12-13 (Donnan indicating that, in 2022, she "began seeing substantial problems with Ms. Pattison's performance" and that concerns about professionalism arose later in 2023 and "performance-related concerns" grew); Dkt. 31-1 ¶ 5 (Wade indicating that "the Board gradually became concerned about declining sales under the direction of Ms. Pattison" and began to "question the pipeline data"). McKenna likewise testified to "the repeated failure with Kate to get accurate sales data out of Salesforce" which became "a serious problem." Dkt. 20-5 at 198. McKenna also testified that he began to receive complaints from some members of Plaintiff's team and that there was "discord." *Id.* Plaintiff does not appear to dispute that sales dipped during her tenure as Director of Growth. Dkt. 23-3 ¶ 9 (blaming "dynamic geopolitical circumstances" which meant that "prospective customers tied to those opportunities changed, delay and sometimes uprooting all progress toward closing those deals"). Moreover, it is undisputed that Plaintiff's job as Director of Growth was "fundamentally to grow revenue for the business." Dkt. 20-5 at 148-149. District judges in this Circuit have recognized that an employee does not meet legitimate expectations when sales numbers are declining. *Sweet v. Bank of Am., N.A.*, 2010 WL 11541904, at *4 (M.D.N.C. Mar. 18, 2010), *report and recommendation adopted*, 2010 WL 11541808 (M.D.N.C. June 3, 2010) ("As noted, Plaintiff does not dispute that she was not meeting her sales goals when she was fired."). In her argument, Plaintiff merely asserts she "was performing her job duties at a level that met her employer's

legitimate expectations at the time of the adverse employment act, she says she was while JSI

denies this." Dkt. 23 at 20. At the summary judgment stage, such a flat denial is not enough.[77]

*See White v. Hedwin Corp.*, 2009 WL 3246953, at *3 (D. Md. Oct. 5, 2009) ("Plaintiff's conclusory

assertions as to his performance . . . are not enough to withstand summary judgment."); *Smith v.*

*Strayer Univ. Corp.*, 79 F. Supp.3d 591, 604 (E.D. Va. 2015) ("On summary judgment, this Court

is not required to accept conclusory assertions regarding Plaintiff's own state of mind, motivations,

or perceptions regarding the employment actions at issue."). Accordingly, the summary judgment

record does not reflect that Plaintiff was meeting her employer's legitimate expectations.

iii. Inference of Discrimination/Similarly Situated Comparators

Although Plaintiff does not frame her argument in terms of the *prima facie* case, Plaintiff

is clearly premising any inference of discrimination on the alleged different treatment of similarly

situated comparators. Dkt. 23 at 29 (asserting that she was "paid less than two of her male

counterparts" and that she was replaced with "two men").[78] Where a plaintiff seeks to rely on the

---

[77] Although Plaintiff's declaration certainly contains such a denial, the Court notes that the Opposition's argument in this regard does not cite to it.

[78] Plaintiff's Opposition does not assert any other basis for an inference of discrimination. Dkt. 23 at 29. Nonetheless, from the review of the attempted disputes of fact, it is clear that Plaintiff believes that she was discriminated against because McKenna was biased against "strong women" due to of his divorce. Dkt. 23 at 8 (referring to McKenna hating "strong women" in light of his divorce). Defendant is incorrect in arguing that there can be no sex-based discrimination because "strong" is not a protected class. *Contrast* Dkt. 31 at 11 *with Price Waterhouse v. Hopkins*, 490 U.S. 228, 250-51 (1989) (noting that "[a]n employer who objects to aggressiveness in women but whose positions require this trait places women in an intolerable and impermissible catch 22" that is prohibited by Title VII). Plaintiff, however, has not supported this with more than speculation. Dkt. 23-3 ¶ 6 (connecting "McKenna's bias against women" to "his bad divorce process"); *Goldberg v. B. Green & Co., Inc.*, 836 F.2d 845, 849 (4th Cir.1988) (holding in ADEA case that plaintiff's opinion and conclusory assertions of state of mind and motivation insufficient to withstand summary judgment). Moreover, to the extent Plaintiff's declaration references a single comment from McKenna (which McKenna denies and which is not the premise for Plaintiff's argument in Opposition) about "not letting [her] motherhood impact the amount of business travel, night and weekend time [I] spent working," Dkt. 23-3 ¶ 6, courts have rejected that a such a singular comment, disconnected from any alleged adverse employment action (such as the case here), establishes sex discrimination. *See Kamrass v. Jeffries LLC*, 2020 WL 6807352

30

differential treatment of similarly situated comparators to draw an inference of discrimination, then she must adduce evidence from which it can be determined that the comparators are "similarly-situated *in all respects*," including job descriptions, job standards, supervisors, and "experience, education, and other qualifications." *Spencer v. Va. State Univ.*, 919 F.3d 199, 207-08 (4th Cir. 2019). But, as Plaintiff herself recognizes, she and Cherundolo are not similarly situated. Dkt. 23-3 ¶ 23 ("My background differs greatly from Cherundolo . . . ."). Moreover, Plaintiff and Cherundolo were not hired for the same role. Plaintiff was hired as the Director of Growth, and it is undisputed that Cherundolo was hired to be a "direct-report assistant" to McKenna which was advertised to be an Executive Vice President position. *Compare* Dkt. 20 ¶ 66 *with* Dkt. 23 at 6 (not disputing paragraph 66). The purpose of the "similarly situated" test is to determine whether there are "sufficient commonalities" between the plaintiff and her proposed comparators so as to eliminate other possible explanatory variables. *Ghumman v. Boeing Intelligence & Analytics, Inc.*, 2025 WL 3534099, at *15 (D. Md. Dec. 10, 2025). Here, other possible explanatory variables cannot be eliminated because Defendant is permitted to value Cherundolo's client experience and relationships with DEA, and because Cherundolo was hired to perform a different role than Plaintiff.

So too with Patterson. Plaintiff argues that she and Patterson had different backgrounds. *See* Dkt. 23 at 17 (asserting that Plaintiff had "unique intelligence fusion and software as a service

---

at *8 n. 12 (S.D.N.Y. Nov. 19, 2020) (finding that a comment regarding it being "difficult for working mothers to handle the travel scheduled" is insufficient because "such isolated, stray comments are not linked to any adverse action at issue and are not probative of discrimination"); *Kirkland v. Mabus*, 206 F. Supp. 3d 1073, 1082 (E.D. Va. 2016) (holding that "[i]solated and ambiguous comments" regarding "child care arrangements" which were unconnected to the alleged adverse employment action "do not support an inference of discriminatory animus"); *Cf. Harris v. Home Sales Co.*, 499 F. App'x 285, 291 (4th Cir. 2012) (recognizing that "we have made clear that 'stray or isolated' remarks are insufficient to prove discrimination" and plaintiff's reliance on "only one isolated discriminatory statement" unconnected "any of the incidents concerning his demotion and termination" made district court's grant of summary judgment "warranted").

('SaaS') experience" while "Cherundolo and Patterson were federal policemen"). Again, where Plaintiff alleges she was replaced by must be similarly situated, and Plaintiff herself asserts that she and Patterson were not. *See Rodriguez v. Elon Univ.*, 751 F. App'x 395, 397 (4th Cir. 2018) ("Additionally, the professor who received a promotion whom Rodriguez alleges was less qualified than him was not a tenure-track professor and thus does not qualify as an adequate comparator."). It is undisputed that the DEA is Defendant's largest client and that Patterson is a former Administrator of DEA. Moreover, Plaintiff does not address Patterson's other experience in product and revenue growth. Dkt. 20-2 ¶¶ 17-18. In arguing that Plaintiff was more qualified, Plaintiff makes no comparison of her skills or Patterson's skills to any job description for a Director of Growth. Moreover, although Plaintiff dismisses Cherundolo and Patterson as "federal policemen," there is value for a sales position to familiarity with a client and with how a product is used in the field. *Cf. Nhira v. Thompson Hospitality*, 2016 WL 4699414 at *10 (D. Md. Sept. 8, 2016) (finding that comparator's "experience, reputation, and familiarity with the [relevant customer] account" was a legitimate, nondiscriminatory reason for salary disparity), *aff'd*, 680 F. App'x 228 (4th Cir. 2017); *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998) ("While [plaintiff] may have been qualified to fill the . . . position, this Court is not in a position to second guess executive hiring decisions that are based on legitimate, nondiscriminatory rationales such as superior administrative experience."). Indeed, Courts have held that a plaintiff does not establish a *prima facie* case where she "offers only [her] own evaluation of [a comparator's] skills and experience" and where "documented differences between their experience and skills and the experience and skills of [Plaintiff]" suggest that the comparator may have been "significantly better equipped to offer a broad array of services to [Defendant's] customers." *Ani v. IMI Sys.,*

32

*Inc.*, 2002 WL 1888873, at *12 (S.D.N.Y. Aug. 15, 2002).  Accordingly, the summary judgment record does not support an inference of discrimination.

*    *    *

In short, based on the summary judgment record before the Court, no reasonable juror could determine that Plaintiff has established a *prima facie* case because: (i) several of her identified adverse employment actions are unsupported by the record; (ii) she was not meeting her employer's legitimate expectations; and (iii) she has not identified an applicable comparator or otherwise established an inference of discrimination.  Even if Plaintiff had established a *prima facie* case of sex discrimination, Defendant has satisfied its burden of production in identifying Plaintiff's failure to maintain or increase sales in her role as Director of Growth as a legitimate non-discriminatory reason for her termination and that she was not reliable with her pipeline forecasts.  Dkt. 20 at 26; Dkt. 20-2 ¶ 24 (describing falling sales); Dkt. 20-6 at 80-81 (discussing lack of confidence in the pipeline); Dkt. 20-1 ¶¶ 13-14 (discussing lack of accuracy of pipeline data).  Plaintiff's Opposition does not attempt to establish pretext in this regard.  Dkt. 23 at 29.  Indeed, Plaintiff's declaration suggests that her pipeline data was not accurate because she recognizes that "the prospective customers tied to those opportunities changed" which would "delay and sometimes uproot[] all progress towards closing those deals."  Dkt. 23-3 ¶ 9.  Accordingly, summary judgment will be granted with respect to Plaintiff's claims of sex discrimination.

C.  Pay Discrimination

Plaintiff asserts her claim of pay discrimination under Title VII, the EPA, and the VHRA.  As discussed *supra*, the Title VII and VHRA claims are analyzed together and follow the same basic *McDonnell Douglas* framework as discussed with respect to the claim of sex discrimination.

For EPA claims, the burden-shifting framework is slightly different. *See Evans v. Int'l Paper Co.*, 936 F.3d 183, 196 n. 6 (4th Cir. 2019) (noting that, "[o]nce a plaintiff establishes a prima facie cases of discrimination under the EPA, the burdens of production and persuasion shift to the defendant-employer to show that the wage differential was justified by one of the statutory defenses"). To establish a *prima facie* case under the EPA, a plaintiff must demonstrate: (i) the employer paid different wages to an employee of the opposite sex, (ii) for equal work on jobs requiring equal skill, effort, and responsibility, (iii) all jobs are performed under the same conditions. *Id.* If a plaintiff establishes a *prima facie* claim under the EPA, an employer can escape liability by showing that a factor other than sex justified the pay discrepancy. *See Strag v. Bd. of Trs., 55* F.3d 943, 948 (4th Cir. 1995).

In her Amended Complaint, Plaintiff identified Atkins, Hewitt, Cherundolo, and Patterson as her alleged comparators for purposes of the EPA claim. *See* Dkt. 4 ¶ 132. In her Opposition, Plaintiff abandons claims that Atkins or Hewitt were appropriate comparators. *See* Dkt. 23 at 18 ("DENIED that Earl Hewitt is relevant at all to the compensation analysis as Pattison does not reference him or Atkins in her pay discrimination complaint facts."); *id.* 30 (alleging that "she was paid much less in base salary per year at $195,000 (which she had to work up to) compared to Cherundolo who was paid $250,000 and Patterson who was paid $200,000 at the start of their employment with JSI, both similarly situated male comparators"). Thus, for purposes of the *prima facie* case of the EPA claim, the Court focuses on Cherundolo and Patterson.

With respect to Cherundolo, the summary judgment record does not support that he is an appropriate comparator for purposes of the EPA. For purposes of the EPA, the Fourth Circuit has held that a referenced comparator and the plaintiff "must have virtually identical jobs." *Evans*, 936 F.3d at 196. Thus, "it is not enough to simply show that the comparators hold the same title

and the same general responsibility as the plaintiff." *Id.* Instead, a plaintiff must show that the comparator "performed work 'virtually identical' (or the apparent synonym, 'substantially equal') to the plaintiffs in skill, effort, and responsibility." *Spencer*, 919 F.3d at 203-04. Here, summary judgment record establishes that Plaintiff and Cherundolo were hired for and had different jobs. Plaintiff was hired as the Director of Growth, and it is undisputed that Cherundolo was hired to be a "direct-report assistant" to McKenna which was advertised to be an Executive Vice President position. *Compare* Dkt. 20 ¶ 66 *with* Dkt. 23 at 6 (not disputing paragraph 66). Despite Plaintiff's agreement that Cherundolo was hired to be a "direct-report assistant" to McKenna, Plaintiff attempted (and failed) to dispute a different asserted fact regarding Cherundolo's status in the corporate hierarchy; but even there, Plaintiff conceded that "his role was determined to add an additional layer of management between the three Directors and the President." Dkt. 23 at 19 (attempting to dispute facts without citation to any evidence in the summary judgment record and with providing any basis for any knowledge by Plaintiff of the scope of Cherundolo's role). Accordingly, because Plaintiff and Cherundolo did not have "virtually identical jobs," Cherundolo is not an appropriate comparator for purposes of the EPA. *Evans*, 936 F.3d at 196.

With respect to Patterson, the *prima facie* case presents a closer question. Patterson's base salary was $200,000 whereas Plaintiff's base salary was $195,000. *Contrast* Dkt. 20 ¶ 14 (Plaintiff's base salary) *with id.* ¶ 47 (Patterson's base salary). Nonetheless, Defendant has produced evidence that Plaintiff's commission-structure was more favorable to her. Dkt. 20-6. Although Cherundolo's deposition supports that one commission metric was more favorable to Plaintiff than Patterson, the evidence submitted does not establish that this "metric" was significant in any material way or that it compensated for the difference in base salary that Plaintiff received

35

versus what Patterson received when each was Director of Growth.  Thus, Plaintiff has established her *prima facie* case in this regard.

The Court must then assess whether Defendant has established an affirmative defense. Once a plaintiff has made the initial showing of an EPA claim, the burden shifts to the defendant to establish by a preponderance of the evidence that the wage difference was justified by an affirmative defense statutorily set forth in 29 U.S.C. § 206(d)(1).  *See Strag v. Bd. of Trustees, Craven Cmty. Coll.*, 55 F.3d 943, 948 (4th Cir. 1995).  The four affirmative defenses that provide that differential pay is legal are when the difference is made pursuant to: (1) a seniority system; (2) a merit system; (3) "quality of work" system; or (4) another gender-neutral standard.  *See Strag*, 55 F.3d at 948 (citing 29 U.S.C. § 206(d)(1)).  Courts recognize that a difference in experience is a sufficient gender-neutral standard.  *See Watson v. Virginia Dep't of Agric. & Consumer Servs.*, 2021 WL 6498848, at *2 n. 7 (E.D. Va. Mar. 12, 2021), *aff'd* 2022 WL 4244506 (4th Cir. Sept. 15, 2022) ("The evidence also shows that Watson did not have comparable work experience . . . . Thus, even if Watson could establish a prima facie EPA claim, VDACS would still avoid liability."); *Kling v. Montgomery Cnty., Md.*, 324 F. Supp. 3d 582, 596 (D. Md. 2018), *aff'd,* 774 F. App'x 791 (4th Cir. 2019) (granting summary judgment where there was a difference between plaintiff and comparators "education and experience").[79]  Here, it is undisputed that the DEA was

---

[79] *See also Longmire v. Regents of the Univ. of Cal.*, 344 F. App'x 485, 486 (10th Cir. 2009) (affirming grant of summary judgment in favor of defendant where plaintiff "did not have the same skill sets or national reputations and experience as her comparators"); *Blackman v. Fla. Dep't of Bus. & Pro. Regul.*, 599 F. App'x 907, 912 (11th Cir. 2015) (affirming grant of summary judgment where "the DBPR offered sufficient evidence to show that the differential in pay was based on Mr. Baxley's 'auditing experience, management experience, and his education in accounting and business administration'"); *Schaaf v. Smithkline Beecham Corp.*, 2007 WL 9676978, at *54 (N.D. Ga. July 27, 2007), *report and recommendation adopted*, 2008 WL 489010 (N.D. Ga. Feb. 20, 2008) ("Defendant has presented evidence that Fields had broader experience than Plaintiff and that Morgan had broader experience, a higher level of education than Plaintiff, and a higher salary prior to his promotion to the RVP position.").

Defendant's largest customer and that Patterson had spent decades as the *Administrator* of the DEA. Moreover, it is undisputed that Patterson previously managed a billion-dollar contract and revenue for AT&T. Accordingly, even assuming that Plaintiff has established her *prima facie* case, no reasonable juror could find that Defendant has not met its burden of establishing that it relied on a gender-neutral factor, as there is no evidence in the record that Plaintiff approaches this level of experience with Defendant's primary customer. Thus, summary judgment in favor of Defendant on the EPA claim is appropriate.

For the same reasons discussed with respect to the sex discrimination claim and with respect to the EPA claim, the summary judgment record does not establish that a similarly situated comparator exists for purposes of Plaintiff's *prima facie* case of wage discrimination. Accordingly, summary judgment is also appropriate in favor of Defendant in this regard.[80]

### D. Title VII/VHRA Retaliation

A Title VII retaliation case follows the same burden-shifting framework as a discrimination claim. To establish a *prima facie* case of retaliation under Title VII and the VHRA, a plaintiff must show: (1) that she engaged in protected activity; (2) that the employer took a materially adverse employment action against the plaintiff; and (3) that a causal connection exists between the protected activity and the adverse employment action. *Perkins v. International Paper Co.*, 936 F.3d 196, 213 (4th Cir. 2019). If Plaintiff establishes her *prima facie* case, the burden shifts to

---

[80] In her Opposition, Plaintiff argues: "Accepting her allegations as true and granting all reasonable inferences in her favor, she has alleged sufficient facts to make it plausible that she performed 'substantially similar' work requiring the same skill, effort, and responsibility as them, which is ultimately a question for the jury." Dkt. 23 at 30. But this is the standard for a motion to dismiss (which deals in allegations and plausibility), rather than the motion for summary judgment filed by Defendant (which deals in undisputed facts and whether a jury could reasonably find in favor of Plaintiff).

Defendant to articulate a legitimate non-retaliatory reason and then Plaintiff must ultimately establish pretext or demonstrate that there are genuine issues of material fact indicative of discrimination.

It is undisputed that, in September 2023, Plaintiff made a complaint to Bilegan.[81]   It is further undisputed that, in November 2023, Plaintiff was terminated.  This qualifies as an adverse action.  Plaintiff also identifies seven other alleged adverse actions: (1) holding her to higher standards than her male counterparts; (2) disparately disciplining her when her lesser qualified male counterparts were not disciplined; (3) excluding her from meetings; (4) unlawfully denying her of her commissions; (5) demoting her and promoting two lesser qualified males (Cherundolo & Patterson); (6) submitting fabricated claims against her security clearance; and (7) by replacing her with two men.  Dkt. 23 at 31.  Plaintiff's assertion that she was replaced by two men is not separate and apart from her termination.  Additionally, as discussed *supra*, the summary judgment record does not support that Plaintiff was excluded from meetings, denied commissions, or demoted.  Plaintiff's assertion that there were fabricated claims against her security clearance is not supported by the summary judgment record.  *See generally* Dkt. 23 (only mentioning "security clearance" with respect to her argument on retaliation and citing nothing); Dkt 23-3 (not mentioning security clearance at all).  So too her claims of discipline are unsupported.  *See* Dkt. 23 at 5 ("Pattison was not written up or disciplined **at all** during her 3-year tenure at JSI" (emphasis original)).  Her claims of being held to a higher standard are not supported by citation to any

---

[81] Although there is some dispute regarding whether the complaint qualifies as a protected activity, because Plaintiff does not mention a protected characteristic with respect to her complaint; Plaintiff avers that Bilegan instructed Plaintiff *not* to include any such reference (which Bilegan denies).  Because the Court cannot resolve this genuine dispute at summary judgment, the Court assumes without deciding that the September 2023 complaint constitutes a protected activity.  But that dispute is otherwise not material, because Plaintiff cannot establish the other elements of her *prima facie* case.

portion of the record nor mentioned outside of her argument and, to the extent, this is a reimagining of her claim that she was made to do more than others that is unsupported by the record as discussed *supra*.

Having determined that the only adverse action is Plaintiff's termination, the Court must next determine whether there is causation. Although Plaintiff argues that there is a dispute in this regard, this is a legal determination rather than a factual one. And a review of the summary judgment record establishes that there is no causation here. The undisputed record at summary judgment establishes that McKenna, the relevant decisionmaker, had already decided to terminate Plaintiff's employment in July and had brought the decision to the Board in August. *See* Dkt. 20-1 ¶¶ 20, 21; Dkt. 31-1 ¶ 9 (McKenna told the Board on August 10, 2023 he had "decided Ms. Pattison's lack of performance and inadequate response to performance feedback required her termination and eventual replacement"); *see Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." (internal quotation marks omitted)); *Francisco v. Verizon S., Inc.,* 756 F. Supp. 2d 705, 726 (E.D. Va. 2010), *aff'd* 442 F. App'x 752 (4th Cir. 2011) (holding that "neither the Plaintiff's direct-evidence theory, nor the *McDonnell Douglas* burden-shifting analysis, can overcome the undisputed timeline which indicates that the decision to terminate Francisco was made *before* the decision-makers knew about Franciscos complaint" (emphasis in original)). That the decision's effect was subsequently delayed while Plaintiff's complaint was investigated does not undermine the fact that the decision to terminated had been made before the existence of any complaint. Accordingly, no reasonable juror could determine that Plaintiff had established her *prima facie* case. Moreover, for the same reasons noted *supra* with respect to sex

39

discrimination, Defendant has produced a legitimate, non-retaliatory reason for Plaintiff's termination and the summary judgment record does not support pretext.

### E.  FMLA Retaliation

The FMLA provides proscriptive rights "that protect employees from discrimination or retaliation for exercising their substantive rights under the FMLA." *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 294 (4th Cir. 2009).  FMLA retaliation claims may rest on circumstantial evidence evaluated under the burden-shifting framework set out in *McDonnell Douglas*.  An FMLA plaintiff claiming retaliation "must first make a prima facie showing that [s]he engaged in protected activity, that the employer took adverse action against h[er], and that the adverse action was causally connected to the plaintiff's protected activity." *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 551 (4th Cir. 2006).  Once the plaintiff proffers evidence establishing her prima facie case, and the employer offers a non-retaliatory reason of the adverse action, the plaintiff "bears the burden of establishing that the employer's proffered explanation is pretext for FMLA retaliation." *Id*.

Here, it is undisputed that Plaintiff engaged in a protected activity when she took maternity leave in July 2022.  As discussed *supra*, the Court also assumes for purposes of the FMLA claim that Plaintiff made an FMLA complaint to Bilegan in September 2023.  With respect to her FMLA claim, Plaintiff asserts the same eight alleged adverse employment actions asserted with respect to the EPA/wage discrimination claim.  Dkt. 23 at 32.  For the same reasons discussed therein, the only actual adverse action is her November 2023 termination.  The Court next considers whether Plaintiff has established causation.  With respect to Plaintiff's FMLA leave, "close temporal proximity between activity protected by the statute and an adverse employment action may suffice to demonstrate causation." *Waag v. Sotera Def. Sols., Inc.*, 857 F.3d 179, 192 (4th Cir. 2017)

(citations omitted); *Clem v. Maryland*, 2021 WL 6126290, at *3 (D. Md. Dec. 28, 2021) (recognizing that courts in this Circuit have "regularly permitted temporal proximity to show causation in FMLA and discrimination cases"). And, as this Court has previously held, "the Court can draw no inference that the two events are causally linked" where "[a]pproximately four months passed between the protected activity and an adverse employment action." *Huan Zhou v. Lowe's Home Centers, LLC,* 2021 WL 2666595, at *8 (E.D. Va. June 29, 2021). Thus, given the approximately 16-month gap between the protected activity and the adverse action here, the record does not support causation in this regard.

Plaintiff's *prima facie* case with respect to her September 2023 complaint also fails based on causation for the same reason that her Title VII/VHRA retaliation claim fails – McKenna had decided to terminate her and brought that decision to the Board *before* she made the complaint. *See Harris v. Maryland Coal. of Fams., Inc.*, 2024 WL 1721071, at *7 (D. Md. Apr. 22, 2024) ("Because the unrebutted evidence shows that MCF's decision to terminate Plaintiff's employment pre-dated her FMLA protected activity, Plaintiff cannot show that FMLA retaliation was the 'but-for cause' of the termination of her employment."). Again, the summary judgment record demonstrates that McKenna, the relevant decisionmaker, had already decided to terminate Plaintiff's employment in July, had brought the decision to the Board in August, and that the first complaint was in September. *See* Dkt. 20-1 ¶¶ 20, 21; Dkt. 31-1 ¶ 9 (McKenna told the Board on August 10, 2023 he had "decided Ms. Pattison's lack of performance and inadequate response to performance feedback required her termination and eventual replacement"). Additionally, for the same reasons discussed *supra* with respect to Plaintiff's other claims, Defendant has produced a legitimate, non-retaliatory reason for Plaintiff's termination and the summary judgment record does not support pretext (nor does Plaintiff argue pretext in this regard).

41

## V.  CONCLUSION

In short, Plaintiff has failed to demonstrate any genuine issue of material fact, and Defendant is entitled to judgment on each count of the Amended Complaint.

Accordingly, it is hereby ORDERED that the MSJ (Dkt. 19) is GRANTED; and it is

FURTHER ORDERED that the Clerk of the Court is DIRECTED to enter Rule 58 judgment in favor of Defendant and against Plaintiff on each count of the Amended Complaint and to place this matter among the ended causes.

It is SO ORDERED.

Alexandria, Virginia
August 13, 2026

_____ /s/ _____
Rossie D. Alston, Jr.
United States District Judge